UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAMES BAKER,

               Plaintiff,                             Case No. 15-cv-11313

v.                                           Honorable Thomas L. Ludington

LEAR CORP., et al,

               Defendant.

_____/

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff James Baker brought suit against Defendants Lear Corporation, United Auto Workers (UAW) International, and UAW Local 1819 on April 8, 2015. The complaint alleges one count: a violation of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *See* Compl., ECF No. 1. Baker contends that he was discharged from his job at Lear after being falsely accused of threatening to kill another employee. *Id.* Baker alleges that his discharge violated the Collective Bargaining Agreement (CBA) and that the union breached its duty of fair representation during his grievance proceedings. *Id.*

After the close of discovery, Defendants filed motions for summary judgment. *See* ECF Nos. 31, 32. For the reasons stated below, Defendants' motions for summary judgment will be granted.

**I.**

James Baker was hired by Lear as an hourly worker at its Roscommon plant on May 19, 2010. *See* Baker Dep. I at 7–8, ECF No. 32, Ex. 1. Lear's Roscommon plant manufactures, among other things, internal skeletons for automobile seats. *Id.* at 8. Hourly workers at

Roscommon are represented by United Auto Workers (UAW) Local 1819. *Id.* at 13. Baker worked without incident until June of 2012, when Baker joined an apprentice program for machine repair and maintenance. *See* Letter to Purvis at 1, ECF No. 37, Ex. 5. The apprentice program involved working third-shift. *Id.* Soon after starting the program, Baker began having problems with his third-shift coworkers. *Id.*

### A.

In July 2012, Baker received an invitation from third-shift supervisor Bob Reycraft to attend a meeting at Mr. Reycraft's house for a business venture he was planning. *Id.* Baker attended but declined the business opportunity. *Id.* After the meeting, Baker decided that it was improper for a supervisor to ask a subordinate to participate in a private business venture. *Id.*

Over the next twenty months, Baker submitted six complaints to Lear Management. *See* Kato Dep. at 91, ECF No. 31, Ex. 6. Besides asserting that the meeting at Mr. Reycraft's house was improper, these complaints contained allegations of harassment, equipment sabotage, and retaliation by third shift coworkers. *See* ECF No. 31, Exs. 7, 8, 9, 10, 11, 12, 13. Specifically, Baker asserted that third shift employees had pointed lasers into his eyes while working, that company equipment was being used for personal repairs, that he was being blamed for equipment problems he did not create, and that he was unfairly reported for "birddogging."[1] *See* Letter to Purvis 1. Around the same time, Baker's sister was also having problems with third-shift employees. Royce Dep. at 13–16, ECF No. 32, Ex. 8. Baker believed that the mistreatment suffered by him and his sister was retribution from Mr. Reycraft for refusing to join his business venture. *Id.* at 13.

In the face of this alleged mistreatment, Baker asked for a meeting on November 25, 2013 with Rebecca Purvis, the plant manager; Joel Kato, the human resources manager; and

---

[1] "Birddogging" means paying unnecessary attention to someone. Kato Dep. 99, ECF No. 32, Ex 5.

Deborah White, who was Baker's union representation at the meeting. Baker Dep. II at 17–18, ECF No. 32, Ex. 2. At the meeting, Baker outlined his concerns about the potential retaliation and sabotage and resigned from the apprentice program. *Id.* at 19.

On December 28, 2013, Baker sent Ms. Purvis a letter detailing his complaints about the workplace and requesting a response from Lear. *See* Letter to Purvis 1. On January 31, 2014, Ms. Purvis responded in writing. Letter to Baker, ECF No. 31, Ex. 12. Ms. Purvis explained, in part, that the company had found no evidence of harassment or retaliation. *Id.*

**B.**

In January 2014, Baker returned to first shift. Baker Dep. I at 38–39. On January 29, 2014, Baker reported another incident of sabotage. Baker Email, ECF No. 31, Ex. 12. This time, Baker also spoke to Debbie Royce about his concerns. Baker Dep. I at 49–50. At the time, Debbie Royce was a union steward, an elected position responsible for representing union members during disputes with the company. Baker Dep. II at 78–83.

On Saturday March 1, 2014, Baker approached Ms. Royce in the cafeteria with an envelope he wanted Ms. Royce to give to Bill Martin, the president of the union, outlining his concerns with ongoing workplace conditions. Baker Dep. I at 49.  At that moment, Ms. Royce was talking with Deborah White about scheduling a meeting to discuss employee complaints about Rebecca Baker, Plaintiff's sister. Royce Dep at 14–15.

According to Ms. Royce, after Baker handed her the package, he began loudly objecting to the complaints lodged against his sister. *Id.* at 15–16. Ms. Royce then walked over to the cooler, and Baker followed while continuing to discuss his sister. *Id.* at 16. Ms. Royce told Baker that she was unable to discuss his sister's case with him. *Id.* According to Ms. Royce, Baker then followed her out of the lunchroom and towards her position on the line. *Id.* Baker was allegedly

shouting that Mr. Reycraft was responsible for the complaints lodged against his sister. *Id.* at 17. Baker then allegedly told Ms. Royce that if anything happened to his sister, he would kill Mr. Reycraft. *Id.* Ms. Royce told him that she did not want to hear anything more. *Id.* Baker then allegedly repeated his threat twice and indicated that something might happen to Ms. Royce as well. *Id.*

According to Baker, he gave Ms. Royce a packet of documents at around 6:35 a.m. Baker Dep. I at 54. He denies saying anything to Ms. Royce about the complaints lodged against his sister. *Id.* Baker also denies threatening to harm Mr. Reycraft. *Id.* at 55.  He further denies talking to Ms. Royce on the floor about anything that day. *Id.* at 55–56.

There were no witnesses who heard the alleged threat. *See* Kato Dep. at 8. However, there are several witnesses who attest that Baker belligerently confronted Ms. Royce on the morning in question. *See* Aff. of Karmen Cornell, ECF No. 31, Ex. 14; Aff. Peggy Silk, ECF No. 31, Ex. 15; Aff. Sid Fuller, ECF No. 31, Ex. 16.

Ms. Royce reported to Mr. Kato, the human resources manager for the plant, that Baker had threatened to kill Mr. Reycraft. Kato Dep. at 6. On Wednesday March 5, 2014, Mr. Kato met with Baker to discuss the allegation. Deb Royce and Deborah White were also present at the meeting. Baker Dep I at 58. Baker denied making the threat and asked who his union representation was. *Id.* at 59. Mr. Kato did not indicate whether Baker had union representation and suspended Baker pending investigation of the allegation. Kato Dep. at 8. Baker was suspended until May 6, 2014, during which time he completed approximately six counseling sessions with Lear's employee assistance program provider. Baker Dep. I at 65; Kato Dep. at 9–10.

Mr. Kato investigated the alleged threat by asking Ms. Royce to submit a written statement. Kato Dep. at 8. He also asked Ms. Royce if there were any witnesses. *Id.* at 27. Because there were not, Mr. Kato did not interview anyone besides Baker, Ms. Royce, and Ms. White. *Id.* at 16, 27. Mr. Kato testifies that he made the decision to discharge Baker by March 7, 2014, but decided to wait until Baker completed the counseling before informing him. *Id.* at 27. Although the counseling provider ultimately determined that Baker did not have any violent propensities, Mr. Kato believed that Ms. Royce's report was credible. *Id.* at 28–29.

On May 6, 2014, Baker met with Joel Kato and Adam Jelenic, another human resources employee at Lear. Baker Dep. I at 68. Kevin Molner was also present and acting as Baker's union representation. *Id.* at 68.  At the meeting, Mr. Kato informed Baker that he had violated two plant rules and would be discharged. *See* Disciplinary Rep. ECF No. 32, Ex. 13. Specifically, Mr. Kato found that Baker violated Rule A6, which prohibits threatening plant employees, and Rule B2, which prohibits distracting others or causing confusion by unnecessary shouting. *Id.*

## C.

Under the CBA for the Roscommon plant, union members who believe the company has violated the CBA can file a grievance. *See* Collective Bargaining Agreement, ECF No. 32, Ex. 4, at 5–6. Grievances proceed in five steps. In the first step, the employee verbally presents their grievance to their supervisor. *Id.* If the grievance is not resolved, the issue is reduced to writing and submitted to the department manager. *Id.* Under step two, the department manager will review the claim and answer the grievance. *Id.* If not settled at step two, the grievance can be appealed to the Shop Committee. *Id.* Under step three, that committee will consider the claim at its next meeting. *Id.* If still unresolved, a representative from UAW International may initiate

step four by appealing to Lear's director of labor relations. *Id.* If the grievance is still unresolved after step four, UAW International can appeal to arbitration. *Id.*

The UAW rarely resolves a grievance through arbitration. In the past five years, the UAW International representative assigned to Roscommon has appealed only one case to arbitration, and that case involved a different plant. *See* Ebenhoeh Dep. at 57, ECF No. 32, Ex. 3. The UAW has not appealed a grievance that originated in the Roscommon plant to arbitration since at least 2004. Kato V. S. at 5, ECF No. 32, Ex. 14. During that time, UAW has filed numerous grievances at the Roscommon plant where Lear did not settle the grievance or reinstate the employee. *Id.* In each situation, UAW chose not to appeal to arbitration. *Id.* Because the UAW funds the costs of arbitration, the UAW, not the aggrieved employee, makes the decision about whether to appeal to arbitration. *Id.* at 42–43. If the UAW representative believes that the grievance should be appealed to arbitration, the representative must then persuade a UAW executive committee to approve funding for the arbitration. *Id.*

Instead of appealing to arbitration, UAW sometimes attempts to resolve grievances through mediation. Ebenhoeh Dep. at 41–42. UAW prefers mediation to arbitration because it is more economical. Camarata V. S. at 2–3, ECF No. 32, Ex. 15. Mediation is an optional step in the grievance process, but decisions by mediators are generally binding. *Id.* Although the Roscommon CBA did not contain a binding mediation provision at the time Baker filed his grievance, CBAs for other plants did and the current CBA for Roscommon includes a mediation provision. *Id. See also* CBA Excerpts, ECF No. 32, Ex. 15A. Since 2004, grievance mediation has occurred only once at the Roscommon plant, and that one's grievance was Baker's. Kato Dep. at 58.

**D.**

Immediately after his discharge, Baker and his union representative, Mr. Molner, decided to file a grievance pursuant to the procedures set forth in the CBA. Before filing the grievance, Mr. Molner met with Baker, discussed the claims, heard Baker's account, and then prepared the grievance and showed it to Baker for approval. Baker Dep. II at 142. Mr. Molner represented Baker through the first three grievance stages, which Lear denied. *Id.* at 76.

At stage four, Matt Ebenhoeh, a UAW International employee responsible for defending union members in stage four and five grievances, took over representation of Baker. *Id.* Immediately upon beginning his representation of Baker, Mr. Ebenhoeh requested all of Local 1819's investigative notes on the grievance. Ebenhoeh Dep. at 27–28. After reviewing those documents, Mr. Ebenhoeh arranged a meeting with Baker. Baker Dep. II at 78. At that meeting, Mr. Ebenhoeh heard Baker's account of the dispute and discussed the grievance documents with Baker. Ebenhoeh Dep. at 32–33. Mr. Ebenhoeh was unable to find any corroborating witnesses for either Baker's or Royce's account. *Id.* at 29.

Mr. Ebenheoh then advocated for Baker at the stage four hearing before the bargaining committee. *Id.* at 36. After the hearing, the committee offered to reinstate Baker with back pay and move him to second shift if Baker apologized. *Id.* at 41. Baker refused the offer. *Id.*

At this point, Mr. Ebenhoeh had only two options for continuing the grievance: mediation or arbitration. Mr. Ebenhoeh asked Baker if he was willing to use mediation to try and resolve the grievance. *Id.* Baker agreed. *Id.* The mediator chosen was Larry Sedrowski, who Mr. Ebenhoeh believed to be union-friendly and trustworthy. *Id.* at 42. Prior to mediation, Lear asked if Baker would be willing to accept the mediator's decision as binding. *Id.* at 44. The parties agree that Baker wanted to reserve his right to sue Ms. Royce, but they disagree over whether he agreed to make the mediation binding as to his claims against the company. *Id.* at 66. According

- 7 -

to Baker, he was not aware the company agreed to be bound by the mediator's decision and he did not agree to be bound himself. Baker Dep. II at 87.

According to Mr. Ebenhoeh, Baker was asked on three separate occasions before the mediator rendered his decision if he would accept it as binding. Ebenhoeh Dep. at 44. In each instance, Baker agreed. *Id.* Joel Kato, Peter Kamarata, Vern Manning, and Adam Jelenic were present at the mediation on Lear's behalf and likewise assert that Baker agreed to be bound by the decision. Kato V. S. at 2; Camarata V. S. at 3; Manning V. S. at 2, ECF No. 32, Ex. 24; Jelenic V. S. at 2, ECF No. 32, Ex. 25.

Baker brought two affidavits to the mediation which he wanted Mr. Ebenhoeh to use in his defense. Ebenhoeh Dep. at 52. Baker had not provided these affidavits previously. Baker Dep. II at 138–39. The first affidavit, written by Frank Horvath, asserted that Ms. Royce had falsely accused him of making threats in the workplace. Aff. Frank Horvath, ECF No. 32, Ex. 22. Mr. Horvath filed a grievance against Lear, arguing that Ms. Royce's allegations were false. *Id.* After an investigation, Lear rejected the accusations. *Id.* The second affidavit was written by Patrick Eisenhardt, a cousin of Ms. Royce's, and asserted that Ms. Royce was an untrustworthy person. Aff. Patrick Eisenhardt, ECF No. 32, Ex. 23. Mr. Eisenhardt's affidavit also included a text message sent to him by Ms. Royce asking if Mr. Eisenhardt could write a statement indicating he heard Baker make the threat. *Id.* Mr. Eisenhardt believed the text message represented a thinly veiled attempt by Ms. Royce to get him to lie for her. *Id.* Besides those two affidavits, Baker provided the union no other evidence supporting his claim. Baker Dep. II at 137.

Mr. Ebenhoeh chose not to present the two affidavits during the meeting. Ebenhoeh Dep. at 52. Mr. Ebenhoeh decided that Mr. Horvath's affidavit had nothing to do with Baker's case

and that to the extent it demonstrated a tendency by Ms. Royce to lie, it confused the issues. *Id.* at 52–55. Mr. Ebenhoeh decided against using Mr. Eisenhardt's affidavit because he interpreted the message as Ms. Royce simply asking Mr. Eisenhardt if he had heard the threat. *Id.* at 52.

After both sides presented their cases, the mediator denied Baker's grievance. *Id.* at 47. After the mediation, Mr. Ebenhoeh sent Baker a letter indicating that the mediator's resolution was binding and that Baker would not be reinstated. Ebenheoh Letter, ECF No. 32, Ex. 27. On March 15, 2015, Baker sent Mr. Ebenhoeh a letter asking when arbitration would begin and asserting that Mr. Ebenhoeh should have used the affidavits in his defense of Baker. Baker Letter, ECF No. 32, Ex. 28. Baker initiated this suit on April 8, 2015. ECF No. 1.

## II.

Defendants now move for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III.

Defendants Lear and UAW move for summary judgment on Baker's hybrid § 301 claim under the Labor Management Relations Act. To recover through a hybrid § 301 action, the employee must demonstrate both that the employer breached the collective bargaining agreement and that the union breached the duty of fair representation. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir. 1994). Because the two claims are "'inextricably interdependent,'" the employee cannot recover against either party unless the employee makes both showings. *Id.* at 583–84 (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983)).

### A.

Before bringing suit under § 301, an employee must attempt to exhaust internal union remedies. *Clayton v. Int'l Union*, 451 U.S. 679, 681 (1981). Defendant UAW argues that Baker failed to exhaust all grievance procedures before bringing suit and that the suit should consequently be dismissed.

Here, Baker exhausted all remedies. He asserted his grievance through the first four stages provided by the CBA. Although Baker agreed to attempt mediation, he did so at the request of his union representative. The parties dispute whether the mediation was binding, but there is no dispute that the decision whether to bring the grievance to arbitration was solely in the hands of the UAW. Ebenhoeh Dep. at 42–43. *See also Vaca*, 386 U.S. at 194–95. Thus, Baker was unable to control whether the grievance would proceed to arbitration, and the fact that the grievance ended in mediation rather than arbitration does not mean Baker failed to exhaust his administrative remedies. On the contrary, Baker made clear that he wanted to arbitrate his grievance and filed this suit only after Mr. Ebenhoeh made clear that would not happen. *See*

- 10 -

Baker Letter, ECF No. 32, Ex. 28. Baker made a reasonable attempt to exhaust his internal union remedies.

**B.**

The first question under § 301 is whether Baker's discharge violated the CBA. Art. III of the CBA gives Lear the power to discharge an employee for "proper cause." Collective Bargaining Agreement at 3. Although "proper cause" is not defined, the CBA also includes a list of Lear's "Rules and Penalties." *Id.* at 56. That list specifies that employees who violate the rules in List "A" will be subject to immediate discharge. *Id.* Rule A6 prohibits "[t]hreatening, intimidating, coercing, or interfering with employees or supervision at any time." *Id.* at 57.

Company rules can provide a basis for determining whether a "proper cause" requirement is met. The facts here are similar to those in *Highway & Local Motor Freight Empl. Local Union No. 667 v. Wells Lamont*, 69 F. App'x 300 (6th Cir. 2003). There, the parties were disputing the meaning of a "just cause" requirement for termination. *Id.* at 305. The Sixth Circuit explained that an undefined "just cause" requirement would "'draw its essence'" from the terms of the CBA." *Id.* The Court defined "just cause" as cause "'based on reasonable grounds" and for which there is "a fair and honest cause or reason, regulated by good faith.'" *Id.* (quoting BLACK'S LAW DICT. 863 (1990). Thus, under a "just cause" standard, "[the employer] has the authority to terminate any employee, as long as it follows its own guidelines and the termination is not arbitrary and capricious." *Id.* Wells Lamont's list of "Work Rules" was "a list of reasons for termination for 'just cause.'" *Id. See also Blesedell v. Chillicothe Tel. Co.*, No. 2:13-CV-451, 2015 WL 1968870, at *13 (S.D. Ohio May 1, 2015), aff'd, 811 F.3d 211 (6th Cir. 2016) (reasoning that violation of the employer's written "Rules of Conduct" constituted "just cause" for discharge).

- 11 -

The Sixth Circuit has "adopted an 'honest belief' rule with regard to an employer's proffered reason" for an adverse employment action. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir.1998)). Although this rule originated in the employment discrimination context, courts have also applied the rule in § 301 actions when determining whether a corporation violated the CBA by discharging an employee. *See Blesedell*, 2015 WL 1968870 at *14; *Deats v. IUE-CWA*, No. 3:11-CV-00576-TBR, 2013 WL 1729367, at *3 (W.D. Ky. Apr. 22, 2013).   Under the honest belief rule, an employer "has an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made,'" and in that case the employer's proffered reasoning for discharging will be accepted. *Majewski*, 274 F.3d at 1117 (quoting *Smith*, 155 F.3d at 807). The employer need not make a perfect investigation of the apparent reason for discharge. Rather, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

In short, Lear's discharge of Baker violated the CBA's "proper cause" requirement if it did not comply with Lear's own guidelines or was arbitrary and capricious. And if Lear's investigation and decisional process was reasonably conducted and resulted in an honest belief that Baker violated company rules, Lear's decision to terminate Baker was based on sufficient evidence to be non-arbitrary.

Here, Baker has not demonstrated a genuine issue of material fact as to whether his termination violated the CBA. Baker admits that making a death threat would be a legitimate basis for discharge under the CBA. Pl.'s Resp. Mot. Summ. J. at 30. However, Baker argues that Lear terminated him without having sufficient evidence that Baker actually made the threat. *Id.*

- 12 -

Baker first argues that Lear has no precedent at the Roscommon plant for discharging an employee when the sole evidence comes from the employee's accuser. *Id.* Several Lear employees asserted that they had never seen someone discharged solely on the basis of "he said/she said" evidence. *See* Molner Dep. at 28, ECF No. 37, Ex. 19; Fistler Dep. at 49, ECF No. 37, Ex. 21; Jaynes Dep at 20–21, ECF No. 37, Ex. 25. But the lack of precedent for discharging an employee on the sole basis of the accuser's testimony does not by itself establish a material issue of fact as to whether Lear breached the CBA. The CBA contains no provision requiring additional evidence besides the accuser's testimony before discharge; only proper cause is required. *See* Collective Bargaining Agreement at 3. The question is whether Lear's departure from past practice was arbitrary and capricious. Even construing the facts in a light most favorable to Baker, there is no genuine issue of material fact on that question.

Upon receiving Royce's complaint, Mr. Kato conducted an investigation. He asked Ms. Royce for a written statement and met with Baker. Kato Dep. at 7–8. Mr. Kato asked whether there were any witnesses but found that there were none. *Id.* at 27. So he did not speak with any witnesses. *Id.* Mr. Kato's decision, then, came down to whether he believed Baker's or Ms. Royce's story. Mr. Kato testified that he found Ms. Royce to be more credible given his long work history with her. *Id.* at 13–14. Mr. Kato also testified that there was no other reason that he chose to believe Ms. Royce instead of Baker. *Id.* at 15. Once convinced that a threat had been made, Mr. Kato made the decision to discharge Baker because of the threat's seriousness. *Id.* at 31–32.

Mr. Kato's investigation was reasonable under the circumstances. Mr. Kato talked with everyone involved in the dispute. There were no witnesses to the specific details of Baker's conversation with Ms. Royce, so Mr. Kato's failure to interview witnesses was reasonable. And

even though Lear's practice was to not discharge employees in "he said/she said" situations, Mr. Kato's decision to respond decisively to a threat to kill a coworker was reasonable. Considering the unfortunate frequency of workplace violence, a company is certainly justified in discharging an employee it believes to pose a credible threat of violence. Because the alleged threat here was serious, Mr. Kato's departure from past practice was not arbitrary or capricious. Baker has failed to advance any evidence that Lear did not discharge other employees in the past who made similar allegations of violence. Frank Horvath's affidavit indicated that he had been accused by Ms. Royce of making threatening comments yet kept his job, but there is no indication that Ms. Royce accused Mr. Horvath of threatening to kill anyone. *See* Aff. Frank Horvath. In fact, Mr. Kato indicated he had never before dealt with a "threat of grievous harm to somebody." Kato Dep. at 20. Thus, Mr. Kato's departure from past practice was reasonable given the seriousness of the threat.

Even if Mr. Kato's decision to discharge Baker was based on an insufficient factual basis, Baker has still failed to demonstrate a genuine issue of material fact as to whether Mr. Kato honestly believed Baker had made the threat. As the Sixth Circuit stated in the employment discrimination context, "the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (citing *Smith*, 155 F.3d at 806–07). *See also Deats v. IUE-CWA*, No. 3:11-CV-00576-TBR, 2013 WL 1729367, at *4 (W.D. Ky. Apr. 22, 2013) ("[A] genuine factual dispute over the facts relied upon by GE simply does not equate to a genuine factual dispute whether GE reasonably relied on those facts.").

- 14 -

Thus, the mere fact that Baker denies making the threat is insufficient to create a genuine issue of material fact.

Although Baker argues that Lear's true motive in discharging him was to keep Baker from reporting the ongoing equipment sabotage to OSHA, Baker has failed to identify any evidence that Mr. Kato made his decision to discharge on this basis instead of out of an honest belief that Baker threatened Mr. Reycraft. Baker has failed to produce any evidence that Mr. Kato knew Baker was threatening to report the sabotage to OSHA, much less any evidence that Mr. Kato discharged Baker to prevent that report.

In short, even construing the facts in the light most favorable to Baker, Mr. Kato's investigation and decision to discharge Baker was reasonable and non-arbitrary. Mr. Kato believed after his investigation that Baker had threatened to kill a coworker. Because this violated company rules and because of the seriousness of the threat, Mr. Kato decided to discharge Baker. There is no genuine issue of material fact as to whether Lear violated the CBA.

### C.

Because Baker has failed to advance evidence demonstrating a genuine issue of material fact as to whether Lear violated the CBA, summary judgment will be granted in favor of Defendants. Even if Baker was able to establish a genuine issue of material fact on the question of whether Lear violated the CBA, his § 301 claim would still fail because there is no genuine issue of material fact on the question of whether UAW breached its duty of fair representation.

### i.

A union breaches its duty of fair representation only when its conduct towards its members is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). Each of those three bases provides a separate route for a plaintiff to prove breach. *Blesedell v.*

*Chillicothe Tel. Co.*, 811 F.3d 211, 220 (6th Cir. 2016). Judicial review of a union's performance must be "highly deferential." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991). Union representatives are not held to the same standard as lawyers. *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 539 (6th Cir. 2003). *See also Poole v. Budd Co.*, 706 F.2d 181, 185 (6th Cir.1983) ("Union representatives are not to be strictly held to the standards of attorneys.") (citation omitted).

Because the aggrieved employee has no individual right to have his grievance arbitrated under the CBA, "a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious." *Vaca*, 386 U.S. at 194–95. In fact, a breach of the duty of fair representation is not established even if the union chooses to settle the dispute short of arbitration over the employee's objections, providing the union's decision was not arbitrary, discriminatory, or in bad faith. *Id.* at 192. Furthermore, even if the union breached its duty of representation, the plaintiff must still show that the breach substantially impacted the outcome of the proceeding. *Black*, 15 F.3d at 585.

Baker admits that UAW's representation was not discriminatory. Pl.'s Resp. Mot. Summ. J. at 18. Accordingly, the only question is whether Baker has put forth evidence creating a genuine issue of material fact as to whether UAW's representation was arbitrary or in bad faith.

**a.**

UAW's actions in representing Baker were not arbitrary. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (citation omitted). Mere negligence on the union's part does not constitute arbitrariness. *United Steelworkers of Am. v. Rawson*, 495 U.S.

362, 376 (1990). Likewise, "ordinary mistakes, errors, or flaws in judgment also will not suffice." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003). In short, a union's actions are arbitrary only if they were "wholly irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991). A "tactical decision," even if it proves to be a "devastating" miscalculation of strategy, is not a breach of the duty of fair representation. *Garrison*, 334 F.3d at 541.

First, Baker argues that the union violated his *Weingarten* rights by failing to provide representation at the March 3, 2014 meeting where he was suspended pending investigation into the alleged threat. Union employees have a right to refuse to submit to an interview which they reasonably fear may result in discipline without union representation. *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251, 256 (1975). To the extent Baker is asserting a stand-alone *Weingarten* claim, this Court may not consider it because the NRLB has exclusive jurisdiction over activities subject to § 7 of the NLRA. *See San Diego Bldg. Trades Council, v. Garmon*, 359 U.S. 236, 245 (1959). Baker asserted this *Weingarten* claim before the NRLB, which rejected the argument. *See* Dec. 30, 2014 Letter from NRLB, ECF No. 32, Ex. 20. This Court cannot review that decision. *See* 29 U.S.C.A. § 160(f) (providing that final NRLB decisions can be appealed only to federal courts of appeal). To the extent Baker argues that the potential *Weingarten* violation constituted arbitrary behavior by the union, his argument still fails because he has not put forth evidence demonstrating that the lack of representation had any impact on the meeting.

Baker also argues that the union's conduct was arbitrary because his union representatives, Mr. Molner and Mr. Ebenhoeh, failed to investigate his grievance. Specifically, Baker points to their failure to prepare written documents detailing their investigatory findings, as required by UAW procedure. But Mr. Molner and Mr. Ebenhoeh's failure to prepare written

documentation of their findings is, at worst, ordinary negligence. The grievance centered on a single conversation with no witnesses; failing to prepare full written documentation of the investigation for this dispute falls far short of being "wholly irrational." *Air Line Pilots Ass'n*, 499 U.S. at 78.

Likewise, Baker argues that Mr. Ebenhoeh's failure to interview any witnesses, also in violation of UAW policy, was arbitrary. But there were no witnesses of the threat to interview. Mr. Ebenhoeh's failure to interview nonexistent witnesses was not arbitrary.

Baker also argues that Mr. Ebenhoeh acted arbitrarily by convincing him to consent to mediation. Baker has failed to present any evidence that Mr. Ebenhoeh's belief that mediation would be advantageous for Baker was irrational. Mr. Ebenhoeh had used mediation before and believed that the "union-friendly" mediator would be sympathetic to Baker's case. *Id.* at 42.

Finally, Baker argues that Mr. Ebenhoeh breached his duty of fair representation by failing to offer the Horvath and Eisenhardt affidavits at the mediation hearing. But Mr. Ebenheoh's testimony clearly indicates that he read the affidavits, considered their value, and determined that they would not strengthen Baker's case. *See* Ebenhoeh Dep. at 52–53. Even if this was a "devastating miscalculation of strategy," which Baker has not shown, this was still simply a tactical decision on Mr. Ebenhoeh's part and cannot constitute a breach of the duty of fair representation. *See Garrison*, 334 F.3d at 541.

Thus, Baker has failed to put forth evidence demonstrating the existence of a genuine issue of material fact as to whether the union's conduct was arbitrary.

**b.**

Baker also argues that the union acted in bad faith. A union acts in bad faith when "'it acts with an improper intent, purpose, or motive ... encompass[ing] fraud, dishonesty, and other

intentionally misleading conduct.'" *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (quoting *Spellacy v. Airline Pilots Ass'n–Int'l*, 156 F.3d 120, 126 (2d Cir.1998)).

Baker first argues that union represented him in bad faith during the grievance process because there was substantial evidence that Ms. Royce lied about the alleged threat and because Ms. Royce had "personal animus towards Baker." Pl.'s Resp. Mot. Summ. J. at 22–26. Both these arguments improperly focus on the facts of the underlying grievance, not whether UAW's representation was in bad faith. As the Supreme Court held in *Vaca v. Stipes*, "breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious." 386 U.S. 171, 195 (1967).

Baker next argues that Mr. Ebenhoeh's suggestion that mediation be attempted was made in bad faith because it was a deviation from the CBA. But Baker has failed to assert that Mr. Ebenhoeh's recommendation was made with an improper purpose or animus. Mr. Ebenhoeh asserted that he recommended mediation because it was cheaper than arbitration and because he believed it would be helpful to Baker, especially because the mediator chosen was "union-friendly." Ebenhoeh's Dep. at 42. These are proper reasons for recommending mediation, and Baker has failed to put forward any evidence showing that Mr. Ebenhoeh had other, bad faith, reasons for seeking mediation.

Likewise, Baker has failed to put forward any evidence that Mr. Ebenhoeh's investigation was made in bad faith or that Mr. Ebenhoeh's refusal to present the Horvath and Eisenhardt affidavits at the mediation was done in bad faith. Baker argues that the investigation was perfunctory, but the entire dispute centered on a single conversation with no witnesses. Given the straightforward allegations, Mr. Ebenhoeh's quick investigation does not, by itself,

create a question of whether he acted in bad faith. And, as already discussed, Mr. Ebenheoh's decision to not submit the affidavits was a reasoned, tactical decision. Tactical decisions cannot constitute a breach of the duty of fair representation. *Garrison*, 334 F.3d at 541.

Baker further argues that Ms. Royce was present at the mediation hearing and presented ex parte evidence to the mediator, but that Lear and Mr. Ebenhoeh concealed Ms. Royce's presence from him. Baker asserts that Ms. Royce admitted to being present at the mediation hearing, Pl.'s Resp. Mot. Summ. J. at 27, but the Court is unable to find that admission in the record provided. Regardless, Baker has put forward no evidence that Mr. Ebenheoh knew of Ms. Royce's presence. Unless Mr. Ebenheoh consented to Ms. Royce's presence and concealed that fact from Baker, Mr. Ebenheoh did not act with bad faith. Further, Baker has failed to present any evidence that Ms. Royce's presence or testimony at the mediation had any impact on the result.

Finally, Baker argues that he did not agree that the mediation would be binding. Although this fact is disputed, the dispute is not material. UAW was under no obligation to engage in mediation or arbitration. Ebenheoh Dep. at 42–43. Accordingly, even if the mediation was, as Baker argues, nonbinding, UAW was still within its rights to decline to arbitrate the grievance. And Baker has failed to put forward any evidence that UAW's decision not to arbitrate was made in bad faith. On the contrary, UAW was not required to mediate the case, but chose to do so. Baker thus had an extra opportunity to prevail in his grievance. Likewise, because UAW only rarely arbitrates grievance disputes, their decision to forego arbitration here is not, by itself, evidence of bad faith. *See* Ebenhoeh Dep. at 57. Baker has not produced any additional evidence that UAW's decision to decline to arbitrate his grievance was motivated by bad faith.

Baker has therefore failed to put forth evidence raising a genuine issue of material fact on the question of whether UAW represented Baker in bad faith during his grievance.

**ii.**

Even if the employee shows that the union breached its duty of fair representation, the employee must also show that the union's breach so seriously flawed the grievance procedure as to make it "more than likely" that the outcome was affected. *Dushaw v. Roadway Exp., Inc.*, 66 F.3d 129, 132 (6th Cir. 1995). *See also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570 (1976). Baker has failed to identify facts demonstrating a genuine issue of material fact on this question as well.

Baker argues primarily that his UAW representatives should have investigated the claims made in the Horvath and Eisenhardt affidavits early in their representation of him. He asserts that the information in the affidavits could have easily been discovered and, if known by the Lear decision makers, would have "likely affected the outcome at every stage." Pl.'s Resp. Mot. Summ. J. at 29.

But Mr. Kato, the person in charge of deciding whether to discharge Baker, had also handled the allegations that Ms. Royce made against Mr. Horvath. Kato Dep. at 44–48, ECF No. 38, Ex. A. Even if there is no evidence that Mr. Kato explicitly considered those previous allegations during Baker's grievance, Mr. Horvath's affidavit did not contain information that Mr. Kato was unaware of. As such, it is unlikely that the affidavit would have changed Mr. Kato's perspective on Baker's grievance.

The Eisenhardt affidavit asserted that Ms. Royce asked Mr. Eisenhardt to fabricate corroborating evidence of Baker's alleged threat. This information would have been new to Mr. Kato. However, Ms. Royce did not send the message to Mr. Eisenhardt until July 15, 2014. Aff.

Patrick Eisenhardt. Because the first four stages of the grievance occurred before the message was sent, *see* Camarata V. S. at 2, that message could not have affected the outcome of those proceedings.

Although Mr. Ebenhoeh refused to submit the two affidavits at the mediation hearing, there is no reason to think the affidavits would have "more than likely" changed the result. The Horvath affidavit provides some evidence that Ms. Royce has lied before, but it offers no direct proof that Ms. Royce lied about Baker's alleged threat. And the message Mr. Eisenhardt received from Ms. Royce could be interpreted, as Mr. Ebenheoh testified he interpreted it, as simply asking if Mr. Eisenhardt had heard the threat. Ebenheoh Dep. at 52. Submission of the affidavits might have improved Baker's chances of winning the mediation, but neither affidavit was sufficiently probative of Baker's arguments as to make it "more than likely" that the ultimate result at mediation would have changed.

Baker further argues that the result of his grievance was likely affected by UAW's failure to investigate whether Baker's threat to report the equipment sabotage to OSHA was the motivation behind his discharge. But Baker has not presented any evidence that Mr. Kato's decision to discharge him stemmed from his threat to make a report to OSHA. Baker's conclusory claim that a proper investigation would have produced evidence likely to affect the outcome of the grievance is entirely without evidentiary support.

Thus, Baker has failed to produce any evidence showing a genuine issue of material fact as to whether UAW's actions or omissions "more than likely" affected the outcome of his grievance.

**IV.**

- 22 -

Accordingly, it is **ORDERED** that Defendants' motions for summary judgment, ECF No. 31 and 32, are **GRANTED.**

It is further **ORDERED** that Count 1 of Plaintiff Baker's complaint, ECF No. 1, is **DISMISSED with prejudice**.


Dated: August 26, 2016                                   s/Thomas L. Ludington
                                                          THOMAS L. LUDINGTON
                                                          United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on August 26, 2016.

                                    s/Michael A. Sian
                                    MICHAEL A. SIAN, Case Manager